```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
SEA TRADE COMPANY LTD., TRADEWINDS :
ENTERPRISE (JERSEY) LTD., ROBINSON :
FLETAMENTOS, S.A., AGENCIA         :
MARITIMA ROBINSON, S.A.C.F.I.,     :    03 Civ. 10254(JFK)
NANI SHIPPING CORP. LTD., and      :    MEMORANDUM OPINION
ADROGUE CHICO, S.A.,               :       AND ORDER
                                   :
                 Plaintiffs,       :
                                   :
          – against –              :
                                   :
FLEETBOSTON FINANCIAL CORP.,       :
                                   :
                 Defendant.        :
----------------------------------X
```

**JOHN F. KEENAN**, **United States District Judge**:

Before the Court is Defendant's motion for summary judgment on its counterclaim for breach of contract.  For the reasons that follow, the motion is denied.

**BACKGROUND**

The following facts are undisputed, unless otherwise noted.

Plaintiff Nani Shipping Corp. ("Nani") was formed in January 1991 by BankBoston International, the private international banking division of BankBoston Corporation ("BankBoston", or the "Bank").  BankBoston was the predecessor-in-interest of Defendant FleetBoston Financial Corp. ("FleetBoston").  The sole principals of Nani were Ricardo Cazou ("Cazou") and his brother, Gerardo Cazou.  On September 19, 1991, the Cazou brothers opened a checking account with BankBoston on

behalf of Nani, during a meeting with Ricardo Carrasco ("Carrasco"), a loan officer for BankBoston who had been dealing with Cazou for some time.  Nani asserts, and the Bank does not contest, that Cazou opened the Nani account with the expectation of incurring overdrafts to fund Plaintiff Adrogue Chico, S.A. ("Adrogue Chico"), an Argentinean real estate development project.  According to Cazou's affidavit, prior to Nani's opening its account, Cazou and Carrasco had several discussions regarding the Adrogue Chico project, during which Cazou informed Carrasco that Nani would not be able to repay overdrafts on its checking account "until such time as the [Adrogue Chico] project was completed and the land could be sold."  (Affidavit of Ricardo Gaston Cazou ("Cazou Aff.") ¶ 4).  According to Cazou, Carrasco "confirmed to Mr. Cazou that Nani Shipping would be allowed to overdraft the account up to $1.5 million and that these overdrafts would not be due until such time as the [Adrogue Chico] project was completed." (Id.)  No document exists memorializing the oral representations that Carrasco allegedly made to Cazou.

In order to open the account with BankBoston, Cazou and Gerardo Cazou signed their names, as Nani's principals, on a signature card provided by Carrasco ("Signature Card").  Printed above the spaces in which the Cazou brothers signed their names was the following statement:

> In consideration of BANK OF BOSTON accepting this
> account, I/we agree to be bound by the regulations
> governing the type of account indicated on the
> reverse, and the rules and standard service charges
> established by the Bank from time to time[.]

(Decl. Of Samuel Koren ("Koren Decl."), Ex. C.).

Among the regulations and rules established by the Bank were the Terms and Conditions for International Private Banking ("Terms and Conditions").  The 1994 edition of the Terms and Conditions contained the following provision, under the heading "Overdrafts"::

> We [BankBoston} have no obligation to allow an
> overdraft in any account.  At our discretion or at your
> [the client's] request, we may allow you to overdraw
> your account.  However, at any time we may require the
> payment of that overdraft plus interest at the rate
> designated by the Bank for overdrawn accounts.  If,
> while obtaining repayment of an overdraft, we incur
> additional expenses, including attorney's fees, you
> will be responsible for those costs.

(Id., Ex. F, at 27.)  The 1998 edition of the Terms and Conditions contained an identical provision regarding overdrafts. (See id., Ex. E, at 25.)  Both the 1994 and 1998 editions of the Terms and Conditions also stated that the Bank had the right to terminate an account if, among other things, the account was repeatedly overdrawn or if overdrafts were not repaid immediately upon the Bank's demand.

Although it was the Bank's policy to send the Terms and Conditions to all clients of its international private banking division, Nani claims that it never received the Terms and

Conditions.  According to the affidavits of Cazou and Gerardo Cazou, Carrasco did not mention the Terms and Conditions at the September 19, 1991 meeting.  The Cazou brothers' affidavits also state that, during the time Nani's account was open, Nani was never made aware that the Terms and Conditions existed or that Nani's account was governed by the Terms and Conditions.

In 1998, Carrasco disappeared after BankBoston began to suspect that he had stolen millions of dollars from the Bank.  In February of 1998, BankBoston froze all of the accounts for which Carrasco had served as the primary loan officer, including Nani's account.  At the time Nani's account was frozen, on or about February 18, 1998, Nani had incurred outstanding overdrafts in the amount of $779,859.25.  Nani's credit privileges were not secured by any collateral or personal guarantees.

After freezing the account, BankBoston contacted Cazou and requested that Nani submit a proposal for the repayment of the overdrafts and that the Bank be provided with financial information for Nani, Adrogue Chico, and Nani's principals in order to allow the Bank to determine whether it should continue its relationship with Nani and Cazou.  Nani did not make any payments and the requested financial information was not provided.  On June 22, 1998, BankBoston issued a charge-off recommendation for the entire overdraft balance of $779,859.25 and closed Nani's account.  To date, the overdraft balance

remains unpaid, a fact which Nani has conceded. (See id., Ex. B, March 26, 2006 Dep. of Ricardo Cazou, at 230.)

On December 29, 2003, Nani and Adrogue Chico commenced this action against FleetBoston,[1] asserting a claim for breach of contract on the ground that the Bank's suspension of Nani's overdraft privileges violated the oral agreement made between Carrasco, as the Bank's agent, and Nani.  Nani and Adrogue Chico contended that the Bank's freezing of Nani's account resulted in the discontinuation of the Adrogue Chico project and resulting damages to the plaintiffs of approximately $7.2 million in lost real estate profits.

On September 27, 2006, after obtaining leave to file an amended answer and counterclaim, FleetBoston asserted a counterclaim for breach of contract, seeking to recover the $779,859.25 in outstanding overdrafts, plus interest and attorneys' fees and costs.  This motion for summary judgment on the counterclaim followed.

**DISCUSSION**

---

[1]Another claim was asserted against FleetBoston by plaintiffs Sea Trade Company, LTD., Tradewinds Enterprise (Jersey) LTD., Robinson Fletamentos, S.A., and Agencia Maritima Robinson, S.A.C.F.I.  On September 9, 2004, the Court dismissed that claim on statute of frauds grounds. See Sea Trade Co. V. Fleet Boston Financial Corp., No . 03 Civ. 10254, 2004 U.S. Dist. LEXIS 18148 (S.D.N.Y. Sept. 9, 2004).  Nani and Adrogue Chico are the only remaining plaintiffs in this case.

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©.  When viewing the evidence, the Court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Delaware & H. R. Co. v. Conrail, 902 F.2d 174, 177 (2d Cir. 1990); see also McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).  To survive the motion, the non-movant must present evidence of a genuine issue of fact that requires a trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986); see also D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).  "The non-moving party may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

FleetBoston has moved for summary judgment on its counterclaim for breach of contract.  Under New York law, which the parties agree applies in this case, to prevail on a claim for breach of contract, a counterclaiming defendant must prove "(1) the existence a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and, (4) damages resulting from the breach." Marks v. New York Univ., 61

6

F. Supp. 2d 81, 88 (S.D.N.Y. 1999) (citation and internal
quotation marks omitted).

The Court must decide whether a contract existed
between the parties and, if so, whether there exists any genuine
issue of triable fact regarding the content of the terms of that
contract.  It is undisputed that the parties formed a contract
when the Cazou brothers signed the Signature Card to open Nani's
checking account with the Bank.  At issue, however, is the
content of the terms under which Nani became bound when its
principals signed the Signature Card.  The Bank contends that the
Signature Card incorporated by reference the Terms and
Conditions.  Thus, according to the Bank, when Nani's principals
signed the Signature Card and agreed to follow the Bank's "rules"
and "regulations", Nani became bound as a matter of law to the
express provisions of the Bank's Terms and Conditions, which
clearly stated that the Bank had no obligation to extend
overdraft privileges to account holders and that the Bank could
demand repayment of existing overdraft balances at any time.

Nani argues that the Signature Card did not incorporate
by reference the Terms and Conditions.  Nani contends that it did
not receive the Terms and Conditions, was not made aware of the
document's existence, and did not intend to be bound by its
provisions.  Instead, Nani claims, it believed that its agreement
with the Bank was governed at least in part by Carrasco's oral

promise that Nani would be allowed to overdraw its account up to

$1.5 million and that the Bank would not require repayment of any

overdrawn sums until the Adrogue Chico project was completed.[2]

The question for the Court, therefore, is whether the

Bank's Terms and Conditions were incorporated by reference in the

Signature Card.  Whether an extrinsic document is deemed to be

incorporated by reference is a matter of law. See Camferdam v.

Ernst & Young Int'l, Inc.,No. 02 Civ. 10100, 2004 U.S. Dist.

LEXIS 2284, at *12 (S.D.N.Y. Feb.12, 2004) (citing Advanced

---

[2] That this alleged oral agreement, in which a bank agreed
to extend to a borrower an unsecured line of credit of up to $1.5
million without terms of repayment or other recourse, is not
barred by the statute of frauds seems surprising.  Nevertheless,
the parties do not address the issue of the statute of frauds,
and it is clear that the alleged oral agreement between Nani and
the Bank does not fall within any of the enumerated provisions of
New York's general Statute of Frauds, N.Y. Gen. Obl. L. § 5-701.
Although the statute bars enforcement of a non-written agreement
which "[b]y its terms is not to be performed within one year from
the making thereof," id. § 5-701(a)(1), in this case the terms of
the oral agreement did not require performance to be completed
within one year.  Specifically, the agreement did not require
Nani to take more than one year to borrow money from the Bank,
complete the Adrogue Chico project, and repay the Bank.  No
matter how unlikely it was that Nani's project would be completed
in less than a year, the mere fact that performance in less than
one year was even possible precludes application of the statute
of frauds. See  Thin Film Lab, Inc. v. Comito, 218 F. Supp. 2d
513, 529-30 (S.D.N.Y. 2002) ("It is well-settled that 'for a
contract to fall within [the one-year] provision of the Statute
of Frauds, there must be absolutely no possibility of performance
of the contract within one year."(quoting Riley v. N.F.S. Serv.,
Inc., 891 F. Supp. 972, 975 (S.D.N.Y. 1995)).

Display Systems, Inc. v. Kent State University, 212 F.3d 1272
(Fed. Cir. 2000) (stating that whether material is incorporated
by reference is a question of law).

The Court agrees that if the Terms and Conditions were
incorporated by reference in the Signature Card, then Nani would
be bound by the Bank's Terms and Conditions as a matter of law,
regardless of whether Nani's principals had actually received or
were aware of the Terms and Conditions' contents. See, e.g.,
Butvin v. DoubleClick, Inc., No. 99 Civ. 4027, 2001 U.S. Dist.
LEXIS 2318, at *16 (S.D.N.Y. Mar. 7, 2001) ("The law simply does
not protect someone who willingly signs an agreement which
references and incorporates other controlling documents which he
or she has not seen.").  However, the Court finds that the
general reference in the Signature Card to the Bank's "rules" and
"regulations" is insufficient as a matter of law to incorporate
the Terms and Conditions.

Under New York law, an extrinsic document is deemed to
be incorporated by reference only when the agreement specifically
references and sufficiently describes the document to be
incorporated, such that the latter "'may be identified beyond all
reasonable doubt.'" PaineWebber, Inc. v. Bybyk, 81 F.3d 1193,
1201 (2d Cir. 1996) (quoting Chiacchia v. Nat'l Westminster Bank
USA, 124 A.D.2d 626, 628 (App. Div. 2d Dep't 1986)) (emphasis
added in Bybyk).  Courts of this Circuit also have observed that,

9

for an extrinsic document to be incorporated by reference in an agreement, "'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'" Bybyk, 81 F.3d at 1201 (quoting Lamb v. Emhart Corp., 47 F.3d 551, 558 (2d Cir. 1995)); see also Creative Waste Mgmt. v. Capitol Envtl. Servs., 429 F. Supp. 2d 582, 602 (S.D.N.Y. 2006) (stating that, before a document will be deemed to be incorporated by reference, the document must be identified beyond all reasonable doubt and "[i]t must be clear that the parties knew of and consented to the terms to be incorporated by reference for these terms to be valid"); 11 Richard L. Lord, Williston on Contracts § 30:25, at 233-34 (4th ed. 1999).

        Here, the language of the Signature Card fails to describe the Bank's Terms and Conditions with sufficient specificity.  The Signature Card makes reference only to general "regulations" and "rules" of the Bank but does not expressly name the Terms and Conditions as the document that contained the applicable regulations.  As the Bank appears to concede, the document entitled Terms and Conditions was not the sole possible source of rules and regulations governing checking accounts but rather was "among the rules and regulations established by [the Bank] during the time the Nani Shipping account was active." (Rep. Mem. at 5.) (emphasis added).  The Signature Card thus makes reference to a general class of extrinsic documents rather

than to a specific document.  Compare American Dredging Co. V.
Plaza Petroleum, Inc., 799 F. Supp. 1335, 1338 (E.D.N.Y. 1992),
(finding extrinsic document to be incorporated by reference where
the name of the incorporated document, "Terms and Conditions of
Sale of Petroleum Products," was highlighted by quotation marks
and followed by the phrase "issued by Plaza Petroleum, Inc. which
is available for review upon request").  Here, the Signature
Card's reference to a class of documents, without more, is
insufficient for the Court to find that the Terms and Conditions
were incorporated by reference.  See, e.g., New Moon Shipping Co.
v. MAN B&W Diesel AG, 121 F.3d 24, 30 (2d Cir. 1997); Sotheby's
v. Federal Express Corp., 97 F. Supp. 2d 491, 500 (S.D.N.Y.
2000); Chiacchia, 124 A.D.2d at 626.

          In addition, it is not clear that Nani knew of or
assented to the provisions of the Terms and Conditions.  Because
the Signature Card refers only generally to "regulations" and
"rules", as discussed above, Nani's knowledge of and assent to
the provisions of the Terms and Conditions cannot be inferred
merely by looking to the express language of the Signature Card.
Although "[e]vidence of knowledge and assent may be found in the
circumstances surrounding the agreement," Lamb, 47 F.3d at 558,
Nani's submissions raise a genuine issue of disputed fact as to
what Nani's principals knew of and assented to when they opened
their account with the Bank.  In deciding this motion for summary

judgment, the Court must credit the affidavits submitted by Nani. See Anderson, 477 U.S. at 255 (stating that, for purposes of summary judgment, the court must believe the evidence submitted by the non-movant).  The affidavits of Cazou and Gerardo Cazou collectively establish that Nani never knew about the Terms and Conditions and, instead, believed that its account with the Bank was governed in part by the promises made by Carrasco.  Although the Bank contends, and Nani does not dispute, that the Terms and Conditions were sent as a matter of routine procedure to account holders, the Bank has not submitted any affidavit, deposition testimony, or other evidence to assert that the Terms and conditions were actually sent to Nani or that Nani received the document.

The Bank also points out that "[t]here is no suggestion (let alone evidence)" that the Cazou brothers, whom the Bank characterizes as "sophisticated, international businessmen", asked to see the Bank's Terms and Conditions. (Rep. Mem. at 4.) However, the Bank cites no authority, nor is the Court aware of any authority, for the proposition that the Cazou brothers were required to request to see the rules and regulations mentioned in the Signature Card or that Nani must allege that its principals requested a copy of the document.  Because the Signature Card did not, as a matter of law, incorporate the Terms and Conditions by reference, it is irrelevant that Nani's principals failed to

request a copy of a document containing the Bank's rules and regulations.

Thus, in light of Nani's submissions, it is not sufficiently clear that Nani's principals knew of and assented to the Terms and Conditions when they signed the Signature Card.

Citing to <u>Krupp v. Franklin Sav. Bank in City of N.Y.</u>, 255 A.D. 15 (App. Div. 1st Dep't 1938), the Bank argues in its reply brief that, as a matter of New York law, the mere reference to rules and regulations on a bank's signature card is sufficient to bind a signatory account holder to those rules and regulations.  <u>Krupp</u>, however, does not carve out any special "signature card" exception to the rule that, for a document to be incorporated into an agreement by reference, the extrinsic document must be referred to with sufficient specificity and the parties must clearly know of and assent to the extrinsic provisions.  In <u>Krupp</u>, the plaintiff, on opening an account with the defendant bank, signed a signature card that "stated that he agreed to the by-laws of the bank and any amendments or additions that might thereafter be made thereto." <u>Id.</u> at 15.  The by-laws were later amended, and the defendant claimed that plaintiff was bound by an amended by-law.  The plaintiff argued that he should not be deemed to be bound by a by-law that did not exist at the time he opened the account.  The court held that, by signing the signature card, the plaintiff expressly agreed to be bound by the

bank's by-laws and any later amendments thereto.  Accordingly,
the court directed a judgment for the bank as a matter of law.

Although the Krupp court did not explicitly address the
requirements for an extrinsic document to be incorporated by
reference, those requirements clearly were satisfied.  In Krupp,
the signature card's reference to the Bank's "by-laws" was a
reference to a specific document that was identifiable beyond any
reasonable doubt, not to a general class of documents.  The
plaintiff's knowledge of and assent to the extrinsic terms could
be inferred.  In addition, there is no indication that the
plaintiff in Krupp offered affidavits or other evidence to show
that he did not know of or assent to extrinsic terms.  Here, by
contrast, the Signature Card did not incorporate the Terms and
Conditions by reference because (i) the Signature Card's
reference to "rules" and "regulations" was not sufficiently
specific; and (ii) Nani's knowledge of and assent to the
extrinsic terms cannot be inferred from the language of the
Signature Card, and Nani has offered evidence to show that it did
not know of and assent to the Terms and Conditions.

In its reply brief, the Bank also appears to contend
that Nani's assertions regarding the alleged oral agreement are
so incredible that they must be discarded.  Specifically, the
Bank argues that, as a responsible financial lending institution,
it never would have agreed to make an unsecured loan to Nani in

order to finance a highly speculative foreign land deal, and to demand repayment only in the event that the land deal was completed.   According to the Bank, it is "beyond absurd" to believe either that the Bank would have entered into such an agreement with Nani or that Nani's principals actually would have believed that the Bank would be willing to make such a deal. (Rep. Mem. at 2.)

Nani's assertions regarding the oral agreement concluded between Carrasco and the Cazou brothers are not so far-fetched that the Court should not credit them on a motion for summary judgment.   It is true that the existence of such a remarkably one-sided oral agreement, in which Nani was promised that it could borrow up to $1.5 million to fund a foreign land deal without providing collateral, personal guarantees, or even financial information, strains credulity.   Nevertheless, the Bank's contention that belief in the existence of such an agreement is "beyond absurd" is belied by the Bank's own actions after the account was opened.   Over a nearly seven-year period, the Bank actually wrote checks to Nani totaling approximately $780,000 and never sought to obtain either collateral or financial documentation from its borrower.   The fact that the Bank continued to extend unsecured credit to Nani for the better part of a decade, without exercising any due diligence regarding Nani's account, is no less absurd than the agreement that Nani

15

claims Carrasco entered into on the Bank's behalf.  It is also
worth noting that it is undisputed that Carrasco was the Bank's
agent, fully endowed with the Bank's authority, when Nani's
account was opened.  Carrasco's later acts of larceny and
disappearance do not release the Bank from the agreements to
which Carrasco committed the Bank when he was acting as a loan
officer.  Under these circumstances, it is not unreasonable to
accept as true, solely for purposes of summary judgment, Nani's
allegations about the existence of an oral agreement between
Carrasco, as the Bank's agent, and Nani.

In sum, because the Terms and Conditions cannot be
deemed as a matter of law to be incorporated by reference in the
Signature Card, a genuine issue of material fact exists as to the
provisions that Nani agreed to be bound by in opening its
checking account with the Bank.  In other words, although it is
undisputed that Nani's principals, by signing the Signature Card,
bound Nani to the Bank's "rules" and "regulations", the content
of the "rules" and "regulations" is a genuinely disputed matter.
As discussed above, Nani contends that its agreement with the
Bank is governed by Carrasco's oral representations; the Bank
contends that its Terms and Conditions are controlling.  This
issue cannot be decided at the summary judgment stage.  The Court
concludes that Nani has submitted evidence "'on which the jury
could reasonably find [for the non-movant].'" Scotto, 143 F.3d at

17

114 (quoting <u>Anderson</u>, 477 U.S. at 252) (alteration in <u>Scotto</u>).

Accordingly, FleetBoston's motion must be denied.

CONCLUSION

Because the Bank's Terms and Conditions cannot be deemed to be incorporated by reference in the Signature Card signed by Nani's principals, a genuine issue of disputed fact exists as to the content of the terms that Nani became bound by when it opened its checking account with the Bank.  Accordingly, FleetBoston's motion for summary judgment is DENIED.  The parties are directed to appear for a status conference on May 17, 2007, at 10:00 am.

SO ORDERED

DATED:    New York, New York
          April 30 , 2007

                         JOHN F. KEENAN
                  United States District Judge

17