UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X
SEA TRADE COMPANY LTD., TRADEWINDS :
ENTERPRISE (JERSEY) LTD., ROBINSON :
FLETAMENTOS, S.A., AGENCIA          :
MARITIMA ROBINSON, S.A.C.F.I.,      :    03 Civ. 10254(JFK)
NANI SHIPPING CORP. LTD., and       :    **OPINION AND ORDER**
ADROGUE CHICO, S.A.,                :
                                    :
                  Plaintiffs,       :
                                    :
         – against –                :
                                    :
FLEETBOSTON FINANCIAL CORP.,        :
                                    :
                  Defendant.        :
---------------------------------X

APPEARANCES:


         For PlaintiffS:
                CHAFFE MCCALL LLP
                1100 Poydras Street
                New Orleans, Louisiana 70163-2300
                     Of Counsel: Derek Walker, Esq.


         For Defendant:
                CLEARY GOTTLIEB STEEN & HAMILTON, LLP
                One Liberty Plaza
                New York, New York 10006
                     Of Counsel: Mitchell Lowenthal, Esq.
                                 Lisa Coyle, Esq.
                                 David Rush, Esq.

**JOHN F. KEENAN, United States District Judge.**

**JOHN F. KEENAN, United States District Judge:**

Plaintiffs Nani Shipping, Inc. ("Nani") and Adrogue Chico, S.A. ("Adrogue Chico," and collectively, the "Plaintiffs") brought this action in diversity against Defendant FleetBoston Financial Corp. (the "Bank," or the "Defendant") for breach of an alleged oral agreement, in which the Bank promised to extend up to $1.5 million in overdraft credit to Plaintiffs for the purpose of funding Adrogue Chico, a real estate development project in Buenos Aires. After loaning approximately $780,000 to Plaintiffs in the form of overdraft credit, the Bank froze Nani's credit privileges. Plaintiffs subsequently filed this lawsuit, claiming that the Bank's refusal to honor the oral contract and extend further credit forced Plaintiffs to abandon their real estate project and caused them to incur approximately $7 million in damages, in the form of unrealized profits on the sale of the real estate. The Bank asserted a counterclaim in which it sought repayment of the funds that Plaintiffs had borrowed but failed to repay.

The Bank now moves for summary judgment dismissing Plaintiffs' claim and in favor of its counterclaim. For the reasons that follow, the Bank's motion to dismiss Plaintiffs' claim is granted but the motion for judgment in favor of its counterclaim is denied.

**BACKGROUND**

The following facts, viewed in a light most favorable to

the non-movant, are undisputed unless otherwise noted. In September 1991, Plaintiff Nani, through its sole principals Ricardo Cazou ("Cazou") and Gerardo Cazou, opened a checking account with BankBoston International, the private banking division of the Bank's predecessor-in-interest, BankBoston Corporation. Cazou formed Nani and opened Nani's account with the Bank at the suggestion of Ricardo Carrasco ("Carrasco"), a former loan officer of the Bank, with whom Cazou had a history of business dealings. Cazou formed Nani and opened the account to facilitate the funding of various investment entities of which Cazou and his brother were the principals, including Plaintiff Adrogue, a 175,000 square meter private residential community that Cazou anticipated developing in a suburb of Buenos Aires.

In March 1997, Cazou and Carrasco orally agreed that the Bank would extend overdraft privileges to Nani in an amount up to $1.5 million for the primary purpose of funding the development of Adrogue Chico. According to Cazou, Carrasco and Cazou agreed that Nani would be required to repay the overdraft debt only upon completion of the Adrogue Chico project. Although it is uncertain whether a definite interest rate was actually discussed between Cazou and Carrasco, it is undisputed that the overdraft rate typically charged by the Bank, and the rate that Cazou understood would be applied to the credit line, was the London Interbank Offered Rate ("LIBOR") plus two percent. Neither Carrasco nor any

other employee of the Bank required that Cazou and/or Nani provide financial information, collateral, personal guarantees or any other information in connection with the agreement.  No written contract or other documentary evidence exists to memorialize the agreement.

In February 1998, the Bank froze Nani's account, as well as all other accounts for which Carrasco served as the primary loan officer.  Carrasco was suspected of embezzling over $60 million of the Bank's money and had disappeared.  At the time Nani's account was frozen, Nani had borrowed from the Bank and not repaid $779,859.25, in the form of overdrafts on its checking account.  It is undisputed that Nani has never repaid the funds it overdrew on its account.

At the time the Bank froze Nani's account, Adrogue Chico was in the process of attempting to obtain necessary approvals from authorities of the municipality of Almirante Brown (the "Municipality") to enable the real estate development project to go forward.  Adrogue Chico's proposed design as an enclosed, or gated, residential community  was unusual at that time in Argentina, and the project was subject to particular scrutiny by the Municipality. In order to obtain approval, or "prefeasability," from the Municipality, Adrogue Chico was required to make certain capital improvements on and around the land where Adrogue Chico was to be built, as well as fund certain projects – such as installation of lighting for a local hockey arena – as a show of good faith.  The

Bank's freezing of overdraft privileges prevented Adrogue Chico from completing these projects and, subsequently, from obtaining the necessary building approvals from the Municipality. In May 1999, the Municipality sent Adrogue Chico a letter, listing the various projects that were required to be completed before approval for the development of the land would be given. The Adrogue Chico development was never built.

On November 14, 2001, Adrogue Chico filed a petition for insolvency relief in the form of a reorganization proceeding (known as a concurso preventivo) in Argentine court. (See Declaration of Lisa M. Coyle ("Coyle Decl."), English Translation of Petition for Voluntary Bankruptcy, Ex. J.) According to its petition, Adrogue Chico listed as the reason for its insolvency the Municipality's refusal to grant the necessary approvals and the resulting lengthy delay in the completion of the project. (Id., Ex. J at 2-7.) In its petition, Adrogue Chico did not list Nani as a creditor, although three other loans were listed[1]; did not list the funding it had received or expected to receive from the Bank, via Nani, as an asset; and did not list its accrued cause of action for breach of contract against the Bank as a contingent asset. Adrogue Chico's proposed plan of reorganization was subsequently approved

_____

[1]Those three loans were: a loan of $2 million from Orient Shipping Rotterdam B.V.; a "mortgage loan" for $150,000 from "Dujobne, et al."; and a "requested" loan from "Mr. Hernan Coti" for $240,000. (Id., Ex. J. at 6.)

by a majority of the company's recognized creditors, as required under the Argentine Bankruptcy Law ("ABL"). On February 20, 2003, the Argentine court issued an order that, among other things, confirmed Adrogue Chico's plan of reorganization, pursuant to the terms of which the claims of all of Adrogue Chico's unsecured creditors were discharged accordingly. (See Coyle Decl., Ex. R, English Translation of Adrogue Insolvency Proceeding Final Order.)

On December 29, 2003, Plaintiffs filed the present action, asserting a claim against the Bank for breach of contract. Plaintiffs alleged that the Bank's cessation of overdraft privileges violated the oral agreement reached by Cazou and Carrasco and caused Adrogue Chico to suffer approximately $7 million in lost real estate profits.[2] In September 2006, the Bank asserted a counterclaim for breach of contract, seeking repayment of the $779,859.25 that Nani had overdrawn, exclusive of costs,

---

[2] Another claim for breach of contract was asserted against the Bank by four other plaintiff companies of which Cazou was a principal (Sea Trade Company, Tradewinds Enterprise (Jersey), Robinson Fletamentos, S.A., and Agencia Maritima Robinson) for the Bank's alleged failure to honor oral agreements regarding extensions of credit to those companies. On September 9, 2004, the Court granted the Bank's motion to dismiss that claim on statute of frauds grounds. See Sea Trade Co. V. Fleet Boston Financial Corp., No. 03 Civ. 10254, 2004 U.S. Dist. LEXIS 18148 (S.D.N.Y. Sept. 9, 2004). The Court denied the Bank's motion, however, to dismiss Adrogue Chico's claim for lack of standing, holding that the complaint adequately alleged that Adrogue Chico was a third party beneficiary of the oral agreement between Nani and the Bank. Nani and Adrogue Chico are thus the sole remaining plaintiffs in this case.

fees, and interest.[3]

All discovery in this case concluded on March 19, 2008. The present motion was fully briefed on July 16, 2008. The Court heard oral argument on July 29, 2008.

## ANALYSIS

*Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Where the moving party meets that burden, the

---

[3] On April 30, 2007, the Court denied the Bank's motion for summary judgment on its counterclaim. <u>See</u> <u>Sea Trade Co. v. FleetBoston Fin. Corp.</u>, No. 03 Civ. 10254, 2007 U.S. Dist. LEXIS 32167 (S.D.N.Y. Apr. 30, 2007). The Bank claimed that Cazou, by signing the Bank's signature card when he opened Nani's checking account in 1991, agreed to be bound by the Bank's rules, embodied in a document entitled "Terms and Conditions," which stated that the Bank was under no obligation to continue to extend overdrafts to its customers and could demand repayment of previously overdrawn amounts at any time. The Court denied the Bank's motion, holding that, because the signature card did not identify the document entitled "Terms and Conditions" with sufficient specificity, Nani was not bound by that document as a matter of law, and an issue of fact remained as to the nature of terms that controlled the agreement between Nani and the Bank.

opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. To defeat a summary judgment motion, the nonmoving party must do "more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); see also Contemporary Mission v. United States Postal Serv., 648 F.2d 97, 107 n.14 (2d Cir. 1981)(stating that an "opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions")(internal citations and quotation marks omitted). Where it is clear that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight" summary judgment should be granted. Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994).

*(A) PLAINTIFFS' CLAIM FOR BREACH OF CONTRACT*

The Bank contends that Plaintiffs' claim must be

dismissed as a matter of law because (i) Plaintiffs' present claim that Adrogue Chico is a third party beneficiary of the alleged oral agreement is fundamentally inconsistent with the representations made by Adrogue Chico in its Argentine insolvency proceedings and thus Plaintiffs are barred from pursuing the claim in this Court; (ii) Plaintiffs have failed to raise a genuine issue of triable fact regarding the existence of the alleged oral agreement; and (iii) Plaintiffs are barred from relief because there is no evidence that the alleged breach caused Plaintiffs' damages, the claimed damages are too speculative, and Plaintiffs made no effort to mitigate those damages.

*The Argentine Bankruptcy Proceeding & Judicial Estoppel*

The Bank argues that Adrogue Chico should be precluded from pursuing the present claim in this Court because of its failure to make certain required disclosures in its Argentine bankruptcy petition. In particular, the Bank contends that Adrogue Chico is barred from bringing this action because it (i) did not list Nani or the Bank as creditors; (ii) did not list the funding it received or expected to receive from Nani as an asset; (iii) did not list the Bank's freezing of the Nani account as the cause of its insolvency; and (iv) did not list the present cause of action against the Bank as an asset. The Bank claims that these omissions now preclude Adrogue Chico from claiming that it is a third party beneficiary to the alleged oral agreement that was concluded

between Nani and the Bank. The Bank asks, in essence, that the Court apply the joint, prudential principles of international comity and judicial estoppel to preclude Adrogue Chico from prosecuting this lawsuit on the ground that the present claim is fundamentally inconsistent with the representations made by Adrogue Chico in its Argentine bankruptcy proceeding.

"Under the principles of international comity, United States courts ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries, allowing those acts and proceedings to have extraterritorial effect in the United States." <u>Rapture Shipping, Ltd. v. Allround Fuel Trading B.V.</u>, 350 F. Supp. 2d 369, 373 (S.D.N.Y. 2004) (quoting <u>Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru</u>, 109 F.3d 850, 854 (2d Cir. 1997) (internal quotation marks omitted)). As the Bank correctly observes, American courts have routinely extended deference to foreign bankruptcy proceedings under the principle of international comity. <u>See</u> <u>Finanz AG Zurich v. Banco Economico S.A.</u>, 192 F.3d 240, 246 (2d Cir. 1999) (observing that the courts of this circuit have "repeatedly noted the importance of extending comity to foreign bankruptcy proceedings"). "The orderly distribution of a debtor's property requires combining all claims against the remaining assets into a single proceeding and, as a result, American courts regularly defer to foreign proceedings in this area." <u>Daly v.</u>

<u>Castro Llanes</u>, No. 98 Civ. 1196, 2001 U.S. Dist. LEXIS 21180, at *7 (S.D.N.Y. Dec. 19, 2001) (citing <u>Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.</u>, 825 F.2d 709, 713-14 (2d Cir. 1987)). "Comity is generally appropriate where the foreign proceedings do not violate the laws or public policy of the United States and if the foreign court abides by fundamental standards of procedural fairness." <u>Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.)</u>, 528 F.3d 162, 171-72 (2d Cir. 2008); <u>see also</u> <u>Ecoban Fin. Ltd. v. Grupo Acerero del Norte, S.A. de C.V.</u>, 108 F. Supp. 2d 349, 352 (S.D.N.Y. 2000). Because Argentine bankruptcy proceedings are deemed by our courts to be "procedurally and substantively fair" and indeed "similar to a chapter 11 case in the United States . . . it is not surprising that other courts in this district have granted comity to Argentine bankruptcies even though Argentine bankruptcy law is not identical to our own." <u>In re Compania de Alimentos Fargo, S.A.</u>, 376 B.R. 427, 435 (Bankr. S.D.N.Y. 2007) (citing cases).

Courts are especially inclined to extend comity to foreign proceedings when a party in the subsequent proceeding in the United States makes "arguments [that] smack of inconsistencies seemingly designed to game the system." <u>Rapture Shipping</u>, 350 F. Supp. 2d at 373. As a result, "the concepts of estoppel, and in particular judicial estoppel, have developed." <u>Id.</u> The doctrine of judicial estoppel prevents a party from "asserting a factual

position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding." Bates v. Long Island R.R. Co., 997 F.2d 1028, 1037 (2d Cir. 1993). Judicial estoppel aims to "preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions" and to "protect judicial integrity by avoiding the risk of inconsistent results in two proceedings." Id. at 1038; see also In Re Galerie de Monnaies of Geneva, Ltd., 62 B.R. 224, 226 (S.D.N.Y. 1986) ("Judicial estoppel is invoked in these circumstances to prevent the party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process.") (internal quotation marks omitted). There are two elements of judicial estoppel. "First, the party against whom the estoppel is asserted must have argued an inconsistent position in a prior proceeding; and second, the prior inconsistent position must have been adopted by the court in some manner." Bates, 997 F.2d at 1038.

Courts frequently invoke judicial estoppel to prevent a party who failed to disclose a claim in bankruptcy proceedings from asserting that claim in a subsequent action. See Negron v. Weiss, No. 06 Civ. 1288, 2006 U.S. Dist. LEXIS 69906, at *8-9 (E.D.N.Y. Sept. 27, 2006) (citing cases) "In the bankruptcy context, 'the rationale for these [estoppel] decisions is that the integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets.'" Kunica v. St. Jean Fin., Inc.,

233 B.R. 46, 58 (S.D.N.Y. 1999) (quoting <u>Rosenshein v. Kleban</u>, 918 F. Supp. 98, 104 (S.D.N.Y. 1996)).  "When an assertion in a bankruptcy proceeding is at issue, the . . . requirement [that the bankruptcy court have adopted the prior inconsistent position] is usually fulfilled when the bankruptcy court confirms a plan pursuant to which creditors release their claims against the debtor." <u>Negron</u>, 2006 U.S. Dist. LEXIS 69906, at *9.  However, if the statements or positions in the prior proceeding can be reconciled with the statements or positions taken in the subsequent proceeding, estoppel does not apply. <u>See</u> <u>Simon v. Safelite Glass Corp.</u>, 128 F.3d 68, 72-73 (2d Cir. 1997). Similarly, the doctrine does not apply if the initial statement was the result of a good faith mistake or unintentional error. <u>Id.</u> at 73.

Plaintiffs do not dispute that this Court should recognize, and defer to, the Argentine bankruptcy proceeding under the principle of international comity.  Nor is there any dispute that, for purposes of the application of judicial estoppel, the Argentine court adopted the position taken by Adrogue Chico when that court confirmed the company's plan of reorganization in February 2003. Rather, Plaintiffs argue that, under Argentine law, they were not required to make the disclosures identified by the Bank. Therefore, the argument goes, Adrogue Chico's pursuit of its claim against the Bank in this court is not fundamentally inconsistent with its representations in the Argentine insolvency

proceeding and judicial estoppel should not apply.

To decide whether Adrogue Chico's position in the Argentine bankruptcy proceeding was inconsistent with its present claim, the Court must look to the applicable provisions of the ABL. The Court must determine whether, under the ABL, Adrogue Chico was required to make the disclosures identified by the Bank and, if the disclosures were in fact required, whether their omission in the Argentine proceeding is fundamentally inconsistent with Adrogue Chico's pursuit of its claim in this Court

The Court's determination of foreign law is governed by Rule 44.1 of the Federal Rules of Civil Procedure, which provides that "[t]he court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination shall be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1.  Thus, the Court "may rely upon its own research and any submissions from the parties when considering foreign law." Haywin Textile Prods. v. Int'l Fin. Inv. & Commerce Bank, Ltd., 137 F. Supp. 2d 431, 434-35 (S.D.N.Y. 2001) (citing Ackermann v. Levine, 788 F.2d 830, 838 n.7 (2d Cir. 1986)).  In construing foreign law under Rule 44.1, "a court may reject even uncontradicted expert testimony and reach its own decisions on the basis of [an] independent examination of foreign legal authorities." Guidi v. Inter-Continental Hotels Corp., No. 95

Civ. 9006, 2003 U.S. Dist. LEXIS 6385, 2003 WL 1907901, at *2 (S.D.N.Y. Apr. 16, 2003) (internal quotations marks and citations omitted). "Courts weigh conflicting expert opinions on foreign law by the 'persuasive force of the opinions they express[].'" Compagnie Noga D'Importation Et D'Exportation S.A. v. Russian Fed'n, No. 00 Civ. 0632, 2008 U.S. Dist. LEXIS 62925, 11-12 (S.D.N.Y. Aug. 15, 2008) (quoting Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998)).

From the parties' initial submissions on this motion, as well as the Court's independent research, certain general principles regarding the ABL are evident. As noted, the insolvency proceeding, or concurso preventivo, that Adrogue Chico underwent "is similar to a chapter 11 case in the United States." In re Compania de Alimentos Fargo, S.A., 376 B.R. at 435. As the court explained in In re Compania de Alimentos Fargo, under the Argentine insolvency process,

> [t]he debtor remains in possession [of its assets] subject to the supervision of a court-appointed trustee and the oversight of a creditors committee. . . .[A]n automatic stay prohibits the general creditors from taking actions against the debtor and its assets, and also prohibits the debtor from paying its pre-petition debts. Argentine law provides for the filing and determination of claims, classification and priority of claims, the filing of an acuerdo preventivo (or plan of reorganization), objections to the acuerdo preventivo (including the right to discovery), the voting on the acuerdo preventivo, judicial approval and appellate review.

Id.

In its initial insolvency petition, the debtor is required to make certain disclosures. Under Section 11.3 of the ABL, the debtor is required to "file a detailed statement of assets and liabilities . . . together with an accurate description of the composition of such assets and liabilities, the standards used for valuation, the location and condition of the debtor's property and any liens existing thereon, and all other information that may be required to properly identify the debtor's estate." (Coyle Decl., Ex. CC, Certified Translation of ABL, Concursos y Quiebras, Ley No. 24.522, Articulo 11 (the "ABL") Section 11.3.) In addition, the debtor must "file a list of creditors," and the amounts of the claims held by those creditors, as well as "a detailed description of all judicial or administrative proceedings which involve claims against [the debtor's] assets which are then pending or in which a judgment against the debtor has not yet been satisfied." (Id., Section 11.5.) Further, the debtor is obligated to describe the cause of its insolvency, "explain[ing] the specific reasons for the debtor's financial condition, specifying the time when the suspension of payment occurred and describing the events whereby such suspension of payment became apparent." (Id., Section 11.2.) The disclosures made by the debtor provide the basis for the creditors' vote to approve or deny the proposed plan of reorganization and the Argentine court's subsequent decision to

confirm or reject the plan.  (Id. Sections 45, 52, 56.)

The Bank's expert on Argentine bankruptcy law, Pablo Andres Buey Fernandez ("Fernandez") has submitted a report in which he opines that Adrogue Chico's failure to make certain disclosures in its bankruptcy petition is at odds with its present claim as a third party beneficiary to the alleged oral agreement reached between Nani and the Bank.  Specifically, Fernandez identifies four omissions that are "relevant." (Coyle Decl., Ex O, "Fernandez Report," ¶ 50.)  First, Fernandez notes that neither Nani nor the Bank is mentioned as a creditor in Adrogue Chico's bankruptcy filings and that "[i]f either Nani Shipping or the Bank was a creditor, Adrogue Chico was obligated to include it in the list of creditors it provided to the bankruptcy court pursuant to Section 11.5 of the ABL." (Id.)  Second, Fernandez observes that the bankruptcy filings fail to identify Adrogue Chico as a "third party beneficiary of any funds withdrawn or to be withdrawn by Nani Shipping in accordance with the alleged oral contract," and that if Adrogue Chico was a third party beneficiary, it was "required to include the funds in the list of assets it provided to the bankruptcy court pursuant to Section 11.3 of the ABL." (Id.)  Third, Fernandez states that all of the facts giving rise to the present cause of action had taken place before Adrgoue Chico filed for bankruptcy; thus, Adrogue Chico was required under Section 11.3 of the ABL to list this cause of action against the Bank as an

asset.  Fernandez notes that this is "especially true in light of the magnitude of the claim plaintiffs now assert," namely monetary damages in the amount of $7,000,000, a sum which "is equivalent to almost twice the total value of all of the assets in the bankruptcy proceeding." (Id.)  Finally, Fernandez asserts that Adrogue Chico stated that the reason for its insolvency was "the particularly long process – more than 12 years as of 2001 – that ended with the Municipality's failure to grant the required permits," and not the Bank's "alleged failure . . . to provide financing." (Id. ¶¶ 51, 50.)

Plaintiffs counter with the affidavit of Jorge Taiah, the attorney who filed Adrogue Chico's bankruptcy petition and represented the company throughout the concurso preventivo proceeding.[4]  In his affidavit, Taiah states that Adrogue Chico was not required to identify Nani or the Bank as creditors because "it was not directly indebted to these parties." (Pl. Exhibits to Opposition to Mot. for Summary Judgment ("Pl. Exhibits"), Ex. 2,

[4]The Bank argues that the Court should reject Taiah's affidavit because, among other reasons, Taiah was not disclosed as an expert.  As noted above, however, under Rule 44.1, the Court may consider any relevant materials in construing foreign law, including affidavits submitted by the parties. See Euromepa, S.A. v. R. Esmerian, Inc., 154 F.3d 24, 28 n.2 (2d Cir. 1998).  Although the Court may not use Taiah's affidavit to resolve questions of fact, the Court should consider this evidence insofar as it is useful in determining Argentine law. See Base Metal Trading SA v. Russian Aluminum, 253 F. Supp. 2d 681, 700 (S.D.N.Y. 2003).  The Court should consider what weight, if any, to give Taiah's affidavit and all other relevant material, "rather than to merely strike informative testimony." Id.

English translation of Taiah Affidavit ¶ 6.) Taiah also contends that Adrogue Chico was not obligated, as a purported third party beneficiary to the oral agreement, to list the funds it received or expected to receive from Nani as an asset under Section 11.3 of the ABL. Taiah characterizes the funds received by Nani as assets of Cazou, and his brother Gerardo Cazou, who were the principals of both Nani and Adrogue Chico. Adrogue Chico was simply not required, Taiah states, to "list assets owned or contribute by its principals in the bankruptcy petition regardless of the benefits it might have obtained from such assets." (Id. ¶ 5.) Regarding Adrogue Chico's failure to disclose its accrued cause of action against the Bank, Taiah asserts that Adrogue Chico was not required to identify the cause of action as an asset "because at the time of the bankruptcy proceeding Adrogue Chico had not filed suit against [the Bank]" and "[p]ursuant to Article 11.5, last paragraph, a debtor only has to report as an asset any cause of action that may have commenced at the time the bankruptcy petition was filed." (Id. ¶ 7.) Finally, Taiah contends that Section 11.2 did not obligate Adrogue Chico to list the Bank's alleged breach of the oral agreement as the cause of its insolvency. Taiah observes that Adrogue Chico "disclosed the immediate cause of its failure as a real estate development – the [M]unicality's refusal to grant to it the prefeasability permit," and that there was no obligation under Section 11.2 to describe the Bank's freezing of credit as an

underlying cause. (Id. ¶ 9.)

The Court agrees with Plaintiffs that Section 11 of the ABL did not obligate Adrogue Chico to list Nani or the Bank as creditors; to list the funding it received or may have expected to receive from Nani as an asset; or to list the Bank's breach of the oral agreement as an underlying, or proximate, cause of its insolvency.

Although Section 11.5 of the ABL requires debtors in an insolvency proceeding to "file a list of creditors,"(ABL Section 11.5), no evidence has been presented to show, or even suggest, that Adrogue Chico entered into any borrower-lender relationship with either the Bank or with Nani. The Bank's counterclaim to recover the overdrawn sums is asserted only against Nani, not Adrogue Chico. The evidence has established only that Nani was indebted to the Bank. Adrogue Chico is an entity separate from Nani and there is no claim that Nani acted as Adrogue Chico's alter ego or that Nani's agreement with the Bank otherwise caused a debtor-creditor relationship to arise between Adrogue Chico and the Bank. Accordingly, because neither Nani nor the Bank was a creditor of Adrogue Chico's, the Court finds that Adrogue Chico was not required under Section 11.5 of the ABL to list them in its bankruptcy petition. Thus, Adrogue Chico's failure to include the Bank and Nani from its schedule of creditors under Section 11.5 is not inconsistent with Adrogue Chico's pursuit of the present

action.

Similarly, Adrogue Chico was not required, under Section 11.3 of the ABL, to list the funds it had received or hoped to receive from Nani as an asset. While Adrogue Chico at one point may have expected Nani to provide capital contributions, there is no allegation that Adrogue Chico maintained that expectation in November 2001, at the time it filed its bankruptcy petition, nearly four years after the Bank ceased extending credit to Nani and froze Nani's account. Nor does the Bank offer any authority for the proposition that Adrogue Chico was required, in 2001, to list its former expectation that Nani would supply it with cash among its current or contingent assets. Further, it is undisputed that Nani and Adrogue Chico were separate entities, even though they shared Cazou as a common principal. As Plaintiffs rightly observe, the fact that Cazou had a stake in Nani, and thus in the funds that Nani received from the Bank, cannot be imputed to Adrogue Chico. As Plaintiffs point out, Fernandez himself conceded at his deposition that Argentine bankruptcy law does not require a debtor corporation to list the assets of its shareholders. Thus, to the extent that Cazou, through Nani, contributed capital to Adrogue Chico through cash that Nani borrowed from the Bank, Adrogue Chico was not obligated to list those funds as a separate asset under Section 11.3.

Further, the Court agrees with Plaintiffs that section

11.2 did not require Adrogue Chico to identify the Bank's failure to continue to provide funding to Nani as the reason for its insolvency. Adrogue Chico cited as the direct cause of its insolvency the Municipality's refusal to grant approval for the development of the project. The Bank does not allege that Adrogue Chico's stated reason for its insolvency is false or misrepresentative. Rather, the Bank objects that the stated reason, while perhaps accurate as far as it goes, is not sufficiently comprehensive. While it is true that, according to Plaintiffs' allegations in this lawsuit, the bedrock reason for the financial failure of Adrogue Chico was the Bank's freezing of overdraft credit, Section 11.2 simply requires the debtor to "explain the specific reasons for the debtor's financial conditions, specifying the time when the suspension of payment occurred and describing the events whereby such suspension of payment became apparent." (ABL Section 11.2.) Section 11.2 contains no requirement that a debtor list underlying or proximate causes of insolvency, and the Bank has not offered any persuasive authority in support of its argument. Moreover, Adrogue Chico's failure to list the Bank's breach of contract as a reason for its Argentine bankruptcy is simply not fundamentally inconsistent with its present claims. In this lawsuit, as in Adrogue Chico's bankruptcy filings, Plaintiffs contend that the Municipality withheld building approval, and ultimately doomed the real estate

project, because Adrogue Chico did not complete the expensive public works that the Municipality demanded be completed as a pre-condition to approval.  In sum, Adrogue Chico's disclosure under ABL Section 11.2 is not at odds with its present claim.

Adrogue Chico's failure to list its cause of action against the Bank as a contingent asset pursuant to Section 11.3 of the ABL, however, now bars Adrogue Chico from asserting its claim in this Court.

Under Section 11.3 of the ABL a debtor must

file a detailed statement of assets and liabilities, including the valuation thereof adjusted as the date of filing, together with an accurate description of the composition of such assets and liabilities, the standards used for valuation, the location and condition of the debtor's property and any liens existing thereon, and all other information that may be required to properly identify the debtor's estate.

(ABL Section 11.3.)  In their initial submissions on this motion, the Bank argued that Section 11.3 of the ABL, like the United States Bankruptcy code, requires a debtor to include in its list of assets all causes of action that have accrued in its favor.  As noted above, Plaintiffs disagreed, relying on the "last paragraph" of ABL Section 11.5 in contending that a debtor need list only those causes of action that it has filed and is not required to identify accrued but unfiled causes of action.  To help resolve this dispute, following oral argument, the Court directed the parties to provide contemporaneous supplemental briefing, together

23

with supporting affidavits, citations to Argentine authority, and appropriate translations, on the question of whether Section 11.3 requires a debtor to list causes of action that have accrued in its favor but have not commenced at the time of the filing of a bankruptcy petition.[5]

On the basis of the parties' initial and supplemental submissions, as well as the Court's own research, the Court finds that the ABL, like the United States Bankruptcy Code, requires a debtor to list as assets all causes of actions that have accrued in its favor at the time of the commencement of the insolvency proceeding, regardless of whether the causes of action have actually been filed.

First, it is evident that the disclosure requirement of Section 11.3 is broadly construed. That a debtor is obligated to identify any cause of action that has accrued in its favor accords with the policy aims of the ABL, namely the goal of full disclosure. The Bank has submitted ample authority, in the form of Argentine treatises and case law, to establish that Section 11.3 is read liberally to require a debtor to provide the bankruptcy court, and its creditors, with as comprehensive a description as possible

---

[5] Specifically, the parties were directed to respond to the following question: "Under Section 11.3 of the [ABL], is a debtor in a _concurso preventivo_ proceeding required to list as assets all causes of action that have _accrued_ or is the debtor required only to list causes of action that the debtor has _filed_?" Order, July 31, 2008 (Doc # 80.)

of the debtor's financial condition. _See, e.g.,_ Declaration of David Rush ("Rush Decl."), Ex. JJ, Certified Translation, Civil and Commercial Court of Appeals, Rosario, Jan. 29, 1998, "Gayos, Ramo C./concurso preventivo," Litoral (1998-1, 1045) (Arg.) (stating that the ABL is designed so that all parties "may become fully aware of the real financial condition of the debtor" and that the debtor "must provide a thorough, real, and above all, accurate description of its assets and liabilities"); _see also_ Rush Decl., Ex. MM, Certified Translation, Julio Cesar Rivera, 1 _Instituciones de derecho concursal_ (2d Updated Ed. 2003) (observing that the "requirements [of Section 11.3] are aimed at providing more transparency to the proceeding and reliability to the debtor's filing" and that the debtor who seeks the "extraordinary proceeding" of a reorganization "must bear the burden of providing an accurate, transparent and reliable statement of its financial condition"). As the Bank's expert, Fernandez, states, "the importance of the representations made by the debtor at the time of the filing of the petition can hardly be overstated precisely because they operate as a direct inducement to the court to grant relief and protection under the ABL rules." (Fernandez Report ¶ 43.)

In light of the broad reading given to Section 11.3 and the ABL's overarching goal of full disclosure, there is no reason why causes of action that have accrued in a debtor's favor should

not be included among the debtor's schedule of assets, nor is there any indication that Section 11.3 distinguishes between filed and unfiled causes of action. Fernandez, a professor of law and partner at a leading Argentine bankruptcy firm with nearly thirty years of experience in bankruptcy practice, who has lectured and published extensively on insolvency and related topics, opines that "Section 11.3 contains no exception from the obligation to disclose the debtor's 'assets' for any subset of those assets, including contingent ones like accrued, but as yet not filed, causes of action." (Decl. of Pablo Andres Buey Fernandez ("Fernandez Decl.") ¶ 5.) Fernandez states that, to his knowledge, "the judicial authorities recognize no exception (from the requirement in ABL Section 11.3 to disclose the debtor's assets) that would permit a debtor to omit disclosure of a cause of action that had accrued, but had not been filed." (Id. ¶ 6.) Further, Fernandez asserts that throughout his career, and in the course of his representation of "many dozens of debtors" and creditors, he has never advised his debtor clients to omit an accrued but unfiled cause of action from its schedule of assets, or learned of a proceeding in which a debtor "had failed to disclose the existence of an asset on the ground that it was an accrued, but unfiled, cause of action." (Id. ¶ 7.)

Fernandez's interpretation of Section 11.3 is supported by reference to the United States Bankruptcy Code, on which the ABL

is based.  <u>See</u> <u>In re Compania de Alimentos Fargo, S.A.</u>, 376 B.R. at

435 (observing similarity between Chapter 11 and <u>concurso</u>

<u>preventivo</u> proceedings); Steven L. Schwarcz, <u>Sovereign Debt</u>

<u>Restructuring: A Bankruptcy Reorganization Approach</u>, 85 Cornell L.

Rev. 956, 973 n.103 (2000) ("The reorganization provisions

('Concurso Preventivo') of Argentina's insolvency law . . . are

based on Chapter 11. . . . [T]he Argentine Congress expressly took

Chapter 11 as the model for corporate rehabilitation.") (citation

omitted).  Under the United States Bankruptcy Code, as under the

ABL, a debtor is obligated to provide as full a picture as possible

of its assets.  As the Second Circuit recently explained:

> Our analysis begins with 11 U.S.C. § 541(a)(1), which
> defines the bankruptcy estate as including "all legal or
> equitable interests of the debtor in property as of the
> commencement of the case." It would be hard to imagine
> language that would be more encompassing than this broad
> definition. Every conceivable interest of the debtor,
> future, nonpossessory, contingent, speculative, and
> derivative, is within the reach of § 541. Contractual
> rights clearly fall within the reach of this section, as
> do causes of action owned by the debtor or arising from
> property of the estate.  Given the wide scope of § 541,
> the debtor's obligation to disclose all his interests at
> the commencement of a case is equally broad. <u>See</u> 11
> U.S.C. § 521(a)(1)(B)(i), (iii) (requiring debtor to
> "file . . . a schedule of assets and liabilities . . .
> and a statement of the debtor's financial affairs").
> Because full disclosure by debtors is essential to the
> proper functioning of the bankruptcy system, the
> Bankruptcy Code severely penalizes debtors who fail to
> disclose assets:  While properly scheduled estate
> property that has not been administered by the trustee
> normally returns to the debtor when the bankruptcy court
> closes the case, undisclosed assets automatically remain
> property of the estate after the case is closed.  A
> debtor may not conceal assets and then, upon termination
> of the bankruptcy case, utilize the assets for his own

benefit.
Chartschlaa v. Nationwide Mut. Ins. Co., Nos. 05 Civ. 5988/6603,
2008 U.S. App. LEXIS 17218, at *9-10 (2d Cir. Aug. 14, 2008)
(internal quotation marks, citations and alterations omitted).  In
accord with this broad disclosure requirement, it is well-settled
that a debtor who seeks bankruptcy protection in the United States
must list as an asset any accrued cause of action, regardless of
whether the action has been filed.  See, e.g., Krystal Cadillac-
Oldsmobile GMC Truck Inc. v. General Motors Corp., 337 F.3d 314,
322-23 (3d Cir. 2003) ("The [Bankruptcy] Code requires that a
debtor list potential causes of action, not claims it actually
intends to sue on at the time of the required disclosure."); Seward
v. Devine, 888 F.2d 957, 963 (2d Cir. 1989) ("The bankruptcy
estate. . . includes any causes of action possessed by the
debtor."); Oneida Motor Freight, Inc. v. United Jersey Bank, 848
F.2d 414, 417 (3d Cir. 1988)("It has been specifically held that a
debtor must disclose any litigation likely to arise in a non-
bankruptcy contest."); Kunica, 233 B.R. at 52 ("A basic tenet of
bankruptcy law is that all assets of the debtor, including all pre-
petition causes of action belonging to the debtor, are assets of
the bankruptcy estate that must be scheduled for the benefit of
creditors."); Fedotov v. Peter T. Roach & Assocs., P.C., 354 F.
Supp. 2d 471, 475 (S.D.N.Y. 2005).

     As other courts have recognized, a debtor is obligated to

disclose accrued causes of action even if the debtor does

> not know all the facts or even the legal basis for the cause of action; rather, if the debtor has enough information . . . prior to confirmation to suggest that it may have a possible cause of action, then that is a "known" cause of action such that it must be disclosed. Any claim with potential must be disclosed, even if it is contingent, dependent, or conditional. Viewed against the backdrop of the bankruptcy system and the ends it seeks to achieve, the importance of this disclosure duty cannot be overemphasized.

Browning Mfg. v. Mims (In re Coastal Plains, Inc.), 179 F.3d 197, 208 (5th Cir. Tex. 1999). That the United States Bankruptcy Code – upon which the ABL is modeled – requires a debtor to disclose any cause of action that has accrued in its favor, whether filed or unfiled, militates in favor of reading Section 11.3 of the ABL to impose an identical requirement on Argentine debtors.

Moreover, sound policy concerns compel the Court to agree with the Bank's reading of Section 11.3. As Fernandez rightly observes, allowing a debtor to avoid identifying a cause of action that had accrued in its favor simply by delaying the filing of the case would be "fundamentally unfair: a debtor would be able to hide a valuable asset from its creditors, obtain judicial relief based only upon a partial disclosure of its patrimony, and then keep [that asset] for the sole benefit of its shareholders." (Fernandez Decl. ¶ 6.) This is precisely the reason why courts of this and other circuits have precluded debtors who have failed to identify accrued causes of action in their schedule of assets from pursuing claims on their own behalf after emerging from bankruptcy. See,

e.g., Cannon-Stokes v. Potter, 453 F.3d 446, 449 (7th Cir. 2006); Lewis v. Weyerhaeuser Co., 141 F. Appx. 420, 427-28 (6th Cir. 2005); Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.), 374 F.3d 330, 336 (5th Cir. 2004); Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1288 (11th Cir. 2002); Payless Wholesale Distribs., Inc. v. Alberto Culver, Inc., 989 F.2d 570 (1st Cir. 1993); Oneida Motor Freight, 848 F.2d at 414; Kunica, 233 B.R. at 46; Negron, 2006 U.S. Dist. LEXIS 69906, at *8-9 (E.D.N.Y. Sept. 27, 2006); Kleban, 918 F. Supp. at 104; In re Galerie Des Monnaies of Geneva, Ltd., 55 B.R. 253, 259-60 (S.D.N.Y. 1985).

By contrast, Plaintiffs' reading of Section 11.3, as exempting a debtor from listing accrued but unfiled causes of action, is unsupported by persuasive authority or by convincing reasoning. Plaintiffs argue, first, that the plain language of Section 11.3 limits the assets a debtor is required to identify to "a real and actual account of the estate's financial condition," which "does not include all possible contingent assets of an estate no matter how tenuous, metaphysical or remote the possibility of acquiring the asset at the time of filing the petition." (Pl. Suppl. Mem. in Opp. to Mot. for Summary Judgment ("Pl. Supp. Mem.") at 5.) Plaintiffs maintain that any attempt by Adrogue Chico to declare as an asset a cause of action that had not been "judicially recognized" "would likely have been rejected by the Argentine

bankruptcy court, as declaring contingent, potential, and unquantified assets is of no assistance to a bankruptcy court's ability to determine the actual (as opposed to potential) financial status of the debtor." (Id. at 4.) Plaintiffs state that "bankruptcy law could not function with future claims being admitted as assets." (Id. at 5.) In support of this argument, Plaintiffs have submitted the affidavit of Professor Ricardo Nissen, who states that Section 11.3 "does not extend to any eventual, future and uncertain indemnification, existence of which depends on ordinary legal proceedings which had not even been initiated at the time of the petition for bankruptcy." (Pl. Suppl. Mem., Ex A., Certified Translation of Affidavit of Ricardo Augusto Nissen, ("Nissen Aff."), at 6.)[6] Nissen opines that Section 11.3 does not require the identification of contingent, or future assets, because "to demand such information would conspire against the certainty that the legislator [of the ABL] was pursuing in determining the net worth of the petitioner." (Id.)

Contrary to Plaintiffs' argument, it is evident that bankruptcy law can and does function quite well under a regime that requires a debtor to disclose contingent assets, such as causes of action. As discussed above, a debtor in a United States bankruptcy proceeding is required to list all causes of action, filed or

---

[6]Citations to page numbers of the Spanish-language documents submitted by the parties on this motion are to the page of the English translation of the document.

unfiled, in its schedule of assets, in aid of providing as complete a picture as possible of the debtor's financial condition. To the extent that Plaintiffs protest that bankruptcy law would be hobbled by the requirement that a debtor identify "future claims," an accrued cause of action – such as the cause of action against the Bank that had accrued in Adrogue Chico's favor at the time it sought bankruptcy protection – is simply not a "future claim." It is a contingent claim, all of the facts giving rise to it having occurred long before Adrogue Chico filed its bankruptcy petition. The identification of such a claim, far from rendering the bankruptcy regime unworkable, supports the ABL's goal of full disclosure. Nissen provides no authority, and there is no basis the Court can discern, for his claim that the identification of contingent assets would "conspire against" the precise determination of a debtor's net worth. Beyond question, Adrogue Chico's creditors would have been provided with a more informed understanding of Adrogue Chico's net worth had they been made aware that an action for breach of contract against a major bank, in which Adrogue Chico claimed damages in the amount of $7 million, had accrued in Adrogue Chico's favor.

Plaintiffs also argue that "the requirements listed in Article 11 of the ABL are limited to those explicitly set forth and that courts should refrain from interpreting the article to expand or add requirements not specifically listed." (Id. at 5.) In

support of this argument, Plaintiffs cite to a commentary by Professor Jorge Grispo on Section 11 of the ABL, in which Grispo – quoting "Williams," another commentator on the concurso preventivo – states that the obligations of the debtor under Section 11 of a concurso preventivo proceeding "cannot be worsened by an excessively rigorous interpretation of the requirements that must be satisfied," especially in light of the law's purpose, which is to provide "preventive solutions for financial crisis." (Pl. Suppl. Mem., Ex C., Certified Translation of Jorge Grispo, Tratado Sobre La Ley De Concursos y Quiebras, Ley 24.522, Vol. I, at 1). Plaintiffs do not explain, however, how the determination that a debtor must list accrued but unfiled causes of action constitutes an "excessively rigorous interpretation" of the bankruptcy law. Plaintiffs do not contend, for example, that requiring Adrogue Chico to have identified its accrued cause of action against the Bank would have caused its creditors or the Argentine court to have rejected the company's proposed plan of reorganization or otherwise worked a hardship on Adrogue Chico. The requirement that a company identify an accrued cause of action – that is, a cause of action whose underlying facts have all taken place by the time the company files its insolvency petition – is simply not particularly onerous. In Adrogue Chico's case, it is undisputed that the accrued cause of action against the Bank was readily identifiable by November 2001: As Plaintiffs themselves claim, the facts giving rise to the

lawsuit were identical to the underlying cause of the insolvency. Indeed, Adrogue Chico was aware, as early as February 1998, when the Bank stopped extending overdraft credit, that an action for breach of contract had accrued against the Bank. Thus, Adrogue Chico's obligations under Section 11 of the ABL cannot be deemed to have been "worsened" by the requirement that it identify its accrued, but as yet unfiled, claim against the Bank.

Plaintiffs also claim that Section 11.5 of the ABL, which concerns the disclosure of a debtor's creditors and pending "judicial or administrative proceedings," requires a debtor to list all pending suits in which the debtor is involved. Therefore, Plaintiffs argue, "[t]he Argentine legislators that drafted the ABL specifically dealt with disclosure of causes of action in Section 11.5. Had they intended to require a debtor to disclose causes of action which had accrued but had not yet been filed they would have done so in the same manner that they explicitly required the debtor to disclose filed judicial proceedings." (Pl. Supp. Mem. at 8.) Plaintiffs contend that, under the doctrine of <u>inclusio unius est exclusio alterius</u>,[7] the fact that Section 11.5 requires a debtor to list all filed lawsuits in which it is involved presumes that "the

_____

[7] The Latin phrase is translated as "to express or include one thing implies the exclusion of the other." <u>Cal. Pub. Employees. Ret. Sys. v. Worldcom, Inc.</u>, 368 F.3d 86, 99 (2d Cir. 2004).

Argentine legislators meant to exclude all other requirements related to judicial proceedings or causes of action of the debtor," and that Section 11.3 therefore does not obligate a debtor to list unfiled causes of action.  (Pl. Suppl. Mem. at 9.)

Plaintiffs' argument, however, is belied by the plain language of Section 11.5.  Both Plaintiffs and the Bank have submitted to the Court a certified English-language translation of Section 11 of the ABL, and the accuracy of the translation is undisputed. (<u>See</u> Certified Translation of Ley 24.522 (Ley de Concursos y Quiebras) Articulo 11, attached as Pl. Suppl. Mem., Ex B. & Coyle Decl., Ex. CC .)  According to the certified translation provided by the parties, Section 11.5 states, in relevant part, "The debtor shall also file a detailed description of all <u>judicial or administrative proceedings which involve claims against its assets</u> which are then pending or in which a judgment against the debtor has not yet been satisfied." (<u>Id.</u>)(emphasis added). Section 11.5, therefore, concerns only pending claims "against" the debtor. Because Section 11.5 has no bearing on lawsuits, filed or unfiled, that have accrued in a debtor's favor, it is irrelevant to the determination of whether unfiled causes of action are assets within the meaning of Section 11.3, and Plaintiffs' reliance on the section is therefore misplaced.

It is worth noting that, in addition to the certified translation provided by both parties, Plaintiffs have offered two

additional translations of Section 11.5.  In their supplemental brief, Plaintiffs quote Section 11.5 as stating that a debtor must identify "judicial or administrative proceedings <u>involving</u> the estate and which are then pending or in which a judgment against the debtor has not yet been satisfied." (Pl. Suppl. Mem. at 7) (emphasis added).  Although Plaintiffs' brief cites to the Nissen Affidavit as the source of this translation, the Nissen Affidavit does not actually contain the language quoted in Plaintiff's brief. Rather, the Nissen Affidavit contains yet another translated version of Section 11.5.  According to Nissen, the relevant portion of Section 11.5 reads as follows:  "The details of any legal or administrative proceedings of a financial nature currently pending or where judgment has not yet been satisfied, specifying their location." (Nissen Aff. at 3.)  Notably, these alternate versions of the statute differ from the certified translation provided by both parties in that they permit Section 11.5 to be interpreted as obligating a debtor to disclose any pending lawsuits, regardless of whether the debtor is a plaintiff or a defendant.  Plaintiffs rely on these translations of Section 11.5, as well as the opinions of Nissen, Grispo, and two other commentators, in support of their argument that "Section 11.5 deals with <u>all</u> judicial proceedings in which the debtor may be involved, not as the Bank claims, only those in which debtor is a defendant." (Pl. Suppl. Mem. at 7.) This, in turn, supports Plaintiffs' contention that the doctrine of

36

*inclusio unius est exclusio alterius* precludes interpreting Section 11.3 as requiring a debtor to list a cause of action as an asset.

The Court accepts as authoritative the identical certified translated versions of Section 11.5 of the ABL that were submitted by both parties. This translation is the only certified direct translation of the statute that the Court has received and, as noted, Plaintiffs do not contest its accuracy. Further, the certified translation of the statute makes more sense than the alternate reading urged by the Plaintiffs. It is logical that Section 11.5, which concerns the disclosure of creditors and related information, would also require the disclosure of pending claims and judgments against the debtor but not require disclosure of judgments and pending claims which are in the debtor's favor. Such claims and judgments are aptly construed as contingent assets and thus are the subject of the disclosures required by Section 11.3.

In sum, the Court agrees with the Bank's conclusions regarding the requirements of Section 11.3 of the ABL. Although Plaintiffs have presented the conclusions of its own experts and translations of commentaries that purportedly support their position, "disagreement among legal experts on content, applicability, or interpretation of foreign law, as here, does not create genuine issues of material fact for summary judgment purposes." <u>Rutgerswerke AG & Frendo S.P.A. v. Abex Corp.</u>, No. 93

Civ. 2914, 2002 U.S. Dist. LEXIS 9965, 2002 WL 1203836, at *16 (S.D.N.Y. June 4, 2002). "Ultimately, it appears that [Fernandez's] conclusions are more persuasive and informative" than those of Plaintiffs' authorities, and "it is the 'persuasive force of the opinions' expressed that is conclusive under Rule 44.1." Faggionato v. Lerner, 500 F. Supp. 2d 237, 245 (S.D.N.Y. 2007) (quoting Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82, 92 (2d Cir. 1998)). In addition, the interpretation of Section 11.3 urged by the Bank comports with the United States Bankruptcy Code, which provides the model for, and shares identical policy goals with, the ABL.

Accordingly, the Court finds that causes of action that have accrued in the debtor's favor, whether filed or unfiled at the time of the commencement of the insolvency petition, are assets within the meaning of ABL Section 11.3 that must be disclosed by the debtor. It is undisputed that Adrogue Chico's claim for breach of contract against the Bank accrued long before November 2001, when Adrogue Chico filed its insolvency petition, and that Adrogue Chico did not disclose this cause of action. Thus, Adrogue Chico failed to fulfill its disclosure obligations under Section 11.3.

Adrogue Chico's omission of the cause of action from its schedule of assets is fundamentally inconsistent with its pursuit of the present claim in this Court and thus invites the application of judicial estoppel. As the court explained in Kleban, 918 F.

38

Supp. at 104-05,

> The courts will not permit a debtor to obtain relief from
> the bankruptcy court by representing that no claims exist
> and then subsequently to assert those claims for his own
> benefit in a separate proceeding. The interests of both
> the creditors, who plan their actions in the bankruptcy
> proceeding on the basis of information supplied in the
> disclosure statements, and the bankruptcy court, which
> must decide whether to approve the plan of reorganization
> on the same basis, are impaired when the disclosure
> provided by the debtor is incomplete.

Similarly, in <u>Payless Wholesale Distribs.</u>, 989 F.2d at 571, the

First Circuit provided a similar rationale for the application of

judicial estoppel against a former debtor that sought to assert an

undisclosed claim after the conclusion of bankruptcy proceedings:

> The basic principle of bankruptcy is to obtain a
> discharge from one's creditors in return for all one's
> assets, except those exempt, as a result of which
> creditors release their own claims and the bankrupt can
> start fresh. Assuming there is validity in [the debtor's]
> present suit, it has a better plan. Conceal your claims;
> get rid of your creditors on the cheap, and start over
> with a bundle of rights. This is a palpable fraud that
> the court will not tolerate, even passively. [The debtor]
> having obtained judicial relief on the representation
> that no claims existed, can not now resurrect them and
> obtain relief on the opposite basis.

Adrogue Chico was unquestionably aware that it possessed

a cause of action against the Bank, but it did not disclose that

asset and decided to pursue its claim only after the conclusion of

its Argentine insolvency proceeding. Plaintiffs protest that the

Bank "has not, and cannot, show that Adrogue Chico purposely and

maliciously misled its creditors by failing to disclose its

potential rights against [the Bank]." (Pl. Suppl. Mem. at 2.)
Plaintiffs' argument is unavailing. The Bank is not required to
establish that the debtor's failure to disclose was the product of
malice or "purpose" for judicial estoppel to apply. Rather, the
Court must find only that the failure to list the accrued cause of
action was not "a good faith mistake or unintentional error."
Safelite Glass Corp., 128 F.3d at 73. It is undisputed that
Adrogue Chico was well aware of the facts giving rise to the
present claim by the time it filed its insolvency petition, and
Plaintiffs do not claim that Adrogue Chico's failure to list the
accrued cause of action was the result of inadvertence.

Even assuming, arguendo, that Adrogue Chico mistakenly
believed that it was not required under Argentine law to list its
cause of action as an asset, "[t]he law is clear that legal advice
and ignorance of the law are not defenses to judicial estoppel."
Galin v. IRS, No. 07 Civ. 972, 2008 U.S. Dist. LEXIS 40861, at *21-
22 (D. Conn. May 1, 2008); see also Cannon-Stokes, 453 F.3d at 448
("[A] debtor in bankruptcy, is bound by her own representations, no
matter why they were made . . . . The remedy for bad legal advice
lies in malpractice litigation against the offending lawyer."); In
re Coastal Plains, 179 F.3d at 212 (reliance on counsel's bad
advice did not preclude judicial estoppel in light of debtor's
knowledge of its cause of action and motive to conceal it).

Here, Adrogue Chico not only had knowledge of the facts

40

giving rise to its claim against the Bank, it had the motive to conceal the claim from its creditors. It was only after its plan of reorganization had been confirmed – and its creditors thus released – that Adrogue Chico chose to bring this lawsuit, in which it alleges that the Bank was responsible for its insolvency and seeks $7 million in damages, an amount which far exceeded the total value of Adrogue Chico's assets at the time it sought bankruptcy protection in Argentina. In the event this case went forward and Adrogue Chico obtained damages, its Argentine creditors would see none of the money. Such a result would be patently unfair. Adrogue Chico's conduct "is precisely the sort of 'about-face' that undermines the integrity of the bankruptcy process" and warrants the grant of summary judgment on the basis of judicial estoppel. Rosenshein, 918 F. Supp. at 105.

In sum, the Court finds that Adrogue Chico failed to disclose its accrued cause of action against the Bank as an asset in its Argentine bankruptcy proceeding – a proceeding to which this Court extends deference under the principles of international comity – as was required under Section 11.3 of the ABL. The Argentine court, and Adrogue Chico's creditors, confirmed its plan of reorganization on the basis of the company's incomplete disclosures. Adrogue Chico's assertion of the claim against the Bank in this Court, after it has emerged from bankruptcy, is fundamentally inconsistent with its representations in the prior

proceeding. Under the principle of judicial estoppel, therefore, Adrogue Chico is barred as a matter of law from pursing the present claim. Accordingly, the Court grants the Bank's motion for summary judgment and dismisses Adrogue Chico's claim.

Plaintiffs have conceded that Nani, as "an account formed by the Bank for purposes of funding various business enterprises of Ricardo and Gerardo Cazou, including Adrogue Chico," cannot assert any claim for damages resulting from the Bank's alleged breach of contract, and thus has no viable cause of action. (Pl. Statement of Material and Contested Facts Pursuant to Local Rule 56.1 ¶ 23.) Under New York law, which the parties agree applies in this case, proof of damages is an element of the claim for breach of contract. See Marks v. New York Univ., 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999). Accordingly, Nani's claim also must be dismissed.[8]

*(B) COUNTERCLAIM*

The Bank moves for summary judgment in favor of its counterclaim against Nani for breach of contract. Under New York law, to prevail on a claim for breach of contract, a claimant must prove "(1) the existence a contract; (2) due performance of the

---

[8] Because the Court has found that Adrogue Chico is barred from pursuing its claim under the principle of judicial estoppel, the Bank's argument concerning Plaintiffs' insufficient proof of damages need not be addressed. The Bank's argument regarding the sufficiency of Plaintiffs' proof of the existence of the alleged oral agreement is addressed below, in the context of the Bank's motion for summary judgment in favor of its counterclaim.

contract by the [claimant]; (3) breach of contract by the defendant; and, (4) damages resulting from the breach." Marks, 61 F. Supp. 2d at 88 (citation and internal quotation marks omitted).

Nani does not dispute that it borrowed and failed to repay $779,859.25. Nani contends, however, that under the terms of the oral agreement, it was not obligated to repay the money until the Adrogue Chico project was completed. Thus, Nani claims, in essence, that because a genuine issue of disputed material fact exists as to whether the oral agreement existed, the Court cannot find as a matter of law that Nani was required to repay the Bank at any point prior to the completion of the Adrogue Chico project.

The Bank argues that there is insufficient proof as a mater of law of the oral agreement's existence and that therefore there remains no triable issue of fact regarding Nani's obligation to repay the money it borrowed. Specifically, the Bank contends that Plaintiffs have failed to establish with sufficient definiteness the key terms of the agreement, including (i) when the contract was made; (ii) the rate of interest on the loan; and (iii) the terms of repayment. Thus, the Bank argues, a grant of summary judgment in favor of the counterclaim is warranted.

The Court therefore must determine whether Nani has succeeded in raising a triable issue of fact regarding the

existence of the oral agreement.[9] "A court cannot decree performance of an agreement unless it can discern with reasonable certainty and particularity what the terms of the arrangement are." Brookhaven Housing Coalition v. Solomon, 583 F.2d 584, 593 (2d Cir. 1978). However, rejection of a claim for breach of contract on the ground of indefiniteness is "'is at best a last resort,' appropriate only at 'the point where construction becomes futile.'" Power v. Tyco Int'l (US), Inc., No 02 Civ. 6444, 2006 U.S. Dist. LEXIS 82439, at *4 (S.D.N.Y. Nov. 8, 2006) (quoting Heyman Cohen & Sons v. M. Lurie Woolen Co., 232 N.Y. 112, 114 (1921) (Cardozo, J.)). New York courts have "not applied the definiteness doctrine rigidly. . . . Imperfect expression does not necessarily indicate that the parties to an agreement did not intend to form a binding contract." 166 Mamaroneck Ave. Corp. v. 151 East Post Road Corp., 78 N.Y.2d 88, 91 (1991). An agreement does not fail for indefiniteness if it "invite[s] recourse to an objective extrinsic event, condition or standard on which the amount was made to depend." Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52

---

[9] It should be noted that the parties briefed the issue of the existence of the oral agreement in the context of the Bank's motion to dismiss Plaintiffs' claims, rather than in the context of the Bank's motion for summary judgment in favor of its counterclaim. Regardless of the context in which the issue was addressed, the parties have performed substantial discovery and submitted extensive briefing on the issue. The Court is therefore adequately positioned to determine whether sufficient evidence of the agreement's existence has been presented by the Plaintiffs, at this stage of the litigation, to defeat the Bank's motion for summary judgment on its counterclaim.

N.Y.2d 105, 110 (1981).

Plaintiffs have offered more than enough evidence, at this stage of the litigation, to establish that the oral agreement existed and what the material terms of that agreement were. First, Cazou has never wavered in his assertion that he and Carrasco struck a deal. In addition, Plaintiffs correctly note that the Bank's pattern of dealing with Nani also provides evidence of the existence of the agreement. The Bank contends that Plaintiffs may not be permitted to amend their claim at this stage to assert a claim based on a "course of dealing"; but Plaintiffs are not seeking to add a new claim. Rather, Plaintiffs rightly maintain that the transactions between Nani and the Bank permit an inference that an oral agreement existed. The sheer, undisputed fact that the Bank loaned nearly $780,000 to Nani, without obtaining any collateral, personal guarantees, financial data, or other documentation suggests that an agreement indeed was made between Cazou and Carrasco.

Further, although Cazou displayed some uncertainty in his deposition testimony when he described several of the deal's terms, he nevertheless stated that Carrasco agreed to provide Nani with a $1.5 million line of credit in order to fund the completion of Adrogue Chico, that there was no written agreement, and that repayment was expected only upon the project's completion. (See Pl. Exhibits, Ex. 3, Cazou Deposition ("Cazou Dep.") at 224-28, 234-

45

35.) In his deposition testimony, Cazou stated that he discussed financing with Carrasco in "'97," which corresponds with the allegation in the complaint that the agreement was proposed in "March of 1997" (Compl. ¶ 44); that he believed that the interest rate on the loan was "LIBOR plus 2" and that the listing of the rate in the complaint as "LIBOR + 4" may have been a mistake; and that there was no firm date of repayment because Cazou expected the project to be completed and the loan to be repaid within six months, because Cazou "had a waiting list of people waiting for the land to be ready for us." (Cazou Dep. at 236-377, 239-42.) It is true that Plaintiffs have claimed, variously, that Cazou and Carrasco discussed their alleged agreement "[a]nywhere between 1991 to [19]93" (Coyle Decl., Ex. G, Transcript of Greenberg Dep., at 47); in "March of 1997" (Compl. ¶ 44); and "in August of 1996." (Compl. ¶ 1.) However, Cazou's affidavit, submitted in connection with this motion, clarifies any earlier vagary about when the deal was made (March 1997) and states with certainty the interest rate that the Bank charged for the overdraft line (LIBOR + 2). (Pl. Exhibits, Ex. 8, Cazou Aff. ¶ 4.) Cazou's affidavit is corroborated by the affidavit of his former long-time employee, Lorenzo Towers, who handled the Nani account, communicated regularly with Carrasco, and states in his affidavit that he is prepared to testify that the Bank did indeed extend a $1.5 million credit line to Nani at an interest rate of "LIBOR + 2" for the

purpose, among others, of funding Adrogue Chico. (Pl. Exhibits, Ex. 9, Towers Aff. ¶¶ 3-5. 9.) There is further support that the overdraft line was extended at a rate of LIBOR +2: The Bank's own employee, Joan Duarte, testified at her deposition that this was the standard rate that the Bank charged. (Pl. Exhibits, Ex. 18, Duarte Dep. at 138.) Cazou's earlier uncertainty about the interest rate (and the complaint's misstatement of the rate as "LIBOR + 4") do not render the terms of the alleged agreement fatally indefinite. Plaintiffs' allegations regarding the agreement are further supported by the affidavit of Recaredo Vazquez, Cazou's attorney, who states that, in May and August of 1997, he participated in meetings with Carrasco in which Carrasco discussed the $1.5 million overdraft line and expressed his awareness that the funding would be used primarily to finance Adrogue Chico. (Pl. Exhibits, Ex. 15, Vazquez Aff. ¶ 3.)

The absence of a set repayment schedule also does not cause the agreement to fail for indefiniteness. The pleadings, deposition testimony, and affidavits of Plaintiffs' witnesses all assert that the Bank's loan was to be repaid only upon completion of Adrogue Chico. The agreement thus "'invite[s] recourse' to extrinsic evidence." Point Developers v. FDIC, 921 F. Supp. 1014, 1022 (E.D.N.Y. 1996) (quoting Martin's Delicatessen, Inc., 52 N.Y.2d at 110). Certainly, the definition of "completion" is susceptible to several different interpretations: Was Adrogue

Chico deemed to be completed when the construction was substantially or fully finished, or was the project considered completed only when some or all of the lots were sold?  The evidence produced thus far provides no definite answers to these questions.  However, "contracting parties are often imprecise in their use of language, which is, after all, fluid and often susceptible to different and equally plausible interpretations." 166 Mamaroneck, 78 N.Y.2d at 91.  The existence of unresolved questions regarding the precise meaning of the terms of repayment should therefore be for the trier of fact to resolve and does not warrant dismissal of the complaint.  See, e.g., Point Developers, 921 F. Supp. at 1022 ("While the Court is mindful that th[e] language [of the loan agreement] does appear to omit a number of terms such as how the prevailing rate is to be determined, the payment schedule and the duration of the long term loan, the Court finds that these omissions are not fatal to the plaintiff's claims as a matter of law, at this point.").

The Bank's contention that the affidavits of Cazou, Towers, and Vazquez, submitted in connection with this motion, "patently" contradict Cazou's earlier deposition testimony is unavailing.  "Although it is generally accepted that a later affidavit may not supersede a prior deposition, that rule only applies when the deposition and affidavit conflict." White v. ABCO Eng'g Corp., 221 F.3d 293, 304 (2d Cir. 2000).  When an affidavit

"amplifies or explains, but does not merely contradict" the prior deposition testimony, a party may show that a triable issue of fact exists. Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996). A district court should not reject an affidavit that does not contradict prior sworn testimony if the affidavit creates a genuine issue of fact in opposition to a motion for summary judgment. See Thomas v. Roach, 165 F.3d 137, 144 (2d Cir. 1999). Here, Cazou's affidavit does not "simply reject[] his deposition," and does not constitute a "remarkable about-face," as the Bank maintains in its reply brief. (Pl. Reply Mem. at 7,8.) As noted, Cazou's affidavit merely clarifies or amplifies his deposition testimony, where he stated several times that he could not precisely recall certain terms of the agreement.

Even if Cazou's more recent statements were deemed to be at odds with his prior deposition testimony, Plaintiffs have submitted other evidence, as discussed, including the affidavits of Towers and Vazquez and the deposition testimony of Duarte, that corroborate the statements in Cazou's affidavit. While a party cannot assert "sham issues of fact" to avoid summary judgment, Perma Research and Dev. Co. V. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969), "a party's deposition testimony as to a given fact does not foreclose a trial . . . where that testimony is contradicted by evidence other than the deponent's subsequent affidavit, for when such other evidence is available, the concern that the proffered

issue of fact is a mere 'sham' is alleviated." <u>Palazzo v. Corio</u>, 232 F.3d 38, 44 (2d Cir. 2000) (emphasis added). Thus, even if statements in Cazou's recently submitted affidavit are inconsistent with statements in his deposition testimony, evidence offered by Plaintiffs to corroborate Cazou's affidavit assures the Court that the existence of the oral agreement is not a "sham."

The Bank also insists that the affidavits submitted by Towers and Vazquez should be rejected, because only Cazou – as Plaintiffs' sole Rule 30(b)(6) witness – should be permitted to testify regarding the alleged oral agreement. In addition, the Bank asserts that the affidavits should be rejected because the Bank was not given notice of these witnesses' relevance in their initial disclosures, as required by Rules 26(a) and (e). These arguments are meritless.

"Under Rule 30(b)(6), when a party seeking to depose a corporation announces the subject matter of the proposed deposition, the corporation must produce someone familiar with that subject. To satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make available such number of persons as will be able to give complete, knowledgeable and binding answers on its behalf." <u>Reilly v. Natwest Mkts. Group Inc.</u>, 181 F.3d 253, 268 (2d Cir. 1999) (internal quotation marks and citations omitted). "Testimony of a Rule 30(b)(6) witness is then binding on the party that designated the witness." <u>A&E Prods. Group, L.P. v. Mainetti</u>

USA, Inc., No. 01 Civ. 10820, 2004 U.S. Dist. LEXIS 2904, at *19

(S.D.N.Y. Feb. 25, 2004) (citing, inter alia, 8A Wright, Miller and

Marcus, Federal Practice and Procedure § 2103 (2d ed. 1984)).

However, as the court explained in Mainetti:

> It is true that a corporation is "bound" by its Rule
> 30(b)(6) testimony, in the same sense that any individual
> deposed under Rule 30(b)(1) would be "bound" by his or
> her testimony. All this means is that the witness has
> committed to a position at a particular point in time. It
> does not mean that the witness has made a judicial
> admission that formally and finally decides an issue. .
> . . Evidence may be explained or contradicted. Judicial
> admissions, on the other hand, may not be contradicted.

Id. at *21 (quoting W.R. Grace & Co. v. Viskase Corp., No. 90 Civ.

5383, 1991 U.S. Dist. LEXIS 14651, 1991 WL 211647, at *2 (N.D.

Ill., Oct. 15, 1991) (internal quotation marks omitted).

Here, as discussed above, the recently submitted

affidavits amplify, clarify, and explain Cazou's deposition

testimony; there is no contradiction. Further, the recent

affidavits were submitted in response to the Bank's contention that

Cazou's deposition testimony about the existence of the purported

oral agreement is simply too vague in its description of key terms.

Plaintiffs have the right to offer evidence to corroborate,

explain, and build upon the statements of their Rule 30(b)(6)

witness when that witness's version of events comes under attack.

As another court recently explained, "Nothing in Rule 30(b)(6) has

the effect of tying a corporate party's hands by requiring it to

stick to its deponents' stories (or lack thereof) in its attempts to avoid summary judgment. Indeed, Rule 56(e) requires a non-moving part to go beyond the denials in its pleadings and 'set forth specific facts' by affidavit or otherwise." Empire Home Servs. v. Empire Iron Works, Inc., No. 05 Civ. 72584, 2007 U.S. Dist. LEXIS 29568, at *33 (E.D. Mich. Apr. 23, 2007). The Bank has cited no authority for the proposition that the Court should reject the affidavits of other witnesses that have been submitted in opposition to a motion for summary judgment to support (rather than contradict) the deposition testimony of the non-movant's Rule 30(b)(6) witness.

The Bank's argument that Towers and Vazquez were not properly disclosed as relevant witnesses in Plaintiff's Rule 26 disclosures is also unavailing. Plaintiffs' initial disclosures listed both Towers and Vazquez as among the "individuals [who] are likely to have discoverable information that Plaintiffs may use to support its claims." (Pl. Exhibits, Ex. 13, Rule 26 Initial Disclosures, at 2.) Both Towers and Vazquez were described as possessing the following information: "Background information on Plaintiffs, relationships with Defendant, relevant finances and financial transactions, and damages." (Id. at 3.) In light of these disclosures, the Bank's contention that Towers and Vazquez were not properly identified because "plaintiffs never suggested that Towers or Vazquez had any knowledge about the alleged oral

agreement," is meritless. (Pl. Reply Mem. at 10.) This case has centered on the purported oral agreement that was concluded between Nani and the Bank; the Bank should have assumed that any witness who was identified by Plaintiffs as having knowledge of "relationships with Defendant" and relevant financial transactions between Nani and the Bank may well have possessed discoverable knowledge relating to the oral agreement.

In sum, Plaintiffs have offered sufficient evidence to raise genuine issues of fact about whether the alleged oral agreement existed and about what the material terms of that agreement were. It remains true, as the Court remarked in its prior order denying the Bank's motion for summary judgment in favor of its counterclaim against Nani, that "the existence of such a remarkably one-sided oral agreement, in which Nani was promised that it could borrow up to $1.5 million to fund a foreign land deal without providing collateral, personal guarantees, or even financial information, strains credulity." <u>Sea Trade Co.</u>, 2007 U.S. Dist. LEXIS 32167, at *19. It is also extraordinary that the Bank would consent to be repaid only upon the occurrence of a highly uncertain condition precedent – the "completion" of a speculative real estate development project, namely a gated residential community of a type that was at the time practically unknown in Argentina. Nevertheless, Nani has offered statements which the Court must credit at this stage of the litigation and which serve

to create a dispute about the existence of this alleged agreement. Accordingly, it is for the trier of fact to determine whether an oral agreement was concluded between Nani and the Bank and, if so, whether that agreement allowed Nani to refrain from repaying its debt to the Bank until the completion of the Adrogue Chico project. Summary judgment in favor of the Bank's counterclaim is not warranted.

## CONCLUSION

For the reasons set forth above, the Bank's motion for summary judgment dismissing Plaintiffs claim is GRANTED. The Bank's motion for summary judgment in favor of its counterclaim is DENIED.

The parties are directed to appear for a status conference on October 1, 2008, at 10:00 a.m.

SO ORDERED.

Dated:   New York, New York
         September 4 , 2008


                                    JOHN F. KEENAN
                              United States District Judge